IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELI MOR, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 13-242-RGA |
| STEVEN COLLIS, et al., | : |
| Defendants. | : |

**MEMORANDUM**

On October 28, 2014, I entered a final order and judgment (D.I. 74), which did not decide one issue, namely, who should get "attorneys' fees" and "reimbursement of costs and expenses," and how much that should be. (*Id.* at ¶ 14). Plaintiff was requesting $1,000,000 in attorneys' fees and expenses, a number to which Defendants had agreed. (D.I. 85-1, p. 5). On July 1, 2015, I issued an opinion deciding both parts of the issue, namely, that Plaintiff should get $550,000 in "attorney's fees and expenses." (D.I. 78, p. 13).

There followed an appeal. The Third Circuit vacated the "portion of the [opinion] awarding plaintiff $550,000 in attorneys' fees and expenses," and remanded "for an award of fees and expenses consistent with [the Court of Appeals' opinion]." (D.I. 85-1, p.21). The Court summed up its rationale as the award "was at least partially based on factual assertions which were not supported by the record, and [that I] failed to provide an adequate explanation . . . so that . . . a reviewing court [has] a sufficient basis to review for abuse of discretion." (*Id.*). Thereafter, I had a status conference with the parties. (D.I. 87, 88). At my request, Plaintiff

provided an update on his time and effort spent on this case subsequent to my July 1, 2015, order. (D.I. 89). In short, Plaintiff's attorneys' fees were an additional $101,183.50, and Plaintiff had additional expenses of $3,126.26. (*Id.*).

The Court of Appeals' opinion pointed out one outright error in my earlier decision, namely, that I omitted to consider Plaintiff's expenses, which totaled $14,606. (D.I. 85-1, p. 21 n.8). That was an oversight.[1] I should have awarded Plaintiff's expenses, which were reasonably incurred. I also believe that, since Plaintiff was successful in his appeal, I should award him his additional attorneys' fees and expenses. Thus, as a starting point, I would now award $651,183.50 in attorneys' fees and $17,732.26 in expenses, a total of $668,915.76. Thus, with the understanding that the maximum amount that Plaintiff is seeking is still $1,000,000, I will consider the issues on which the Third Circuit remanded the case.

The Third Circuit identified a number of issues, on which there was insufficient record or insufficient explanation, as issues that I needed to reconsider. I would summarize them as follows:

1. I did "not point to anything in the record supporting" my conclusion that "what happened here was not corporate malfeasance, it was corporate carelessness." To the same effect, I described what happened as "a 'one-off' mistake." (D.I. 85-1, p. 13).

2. I "implie[d]" that a demand letter to the Board would have resolved the dispute, but did not support this with anything in the record. (*Id.*).

3. I "suggest[ed]," without making clear what the basis for me to say so was, that the Plan

---

[1] I am quite confident that, had it been pointed out to me after I issued the July 1, 2015, opinion, I would have concluded that it met the standard for reconsideration, and I would have corrrected it.

-2-

violation would have been detected without investigation by Plaintiff's counsel. (*Id.* at p. 14).

4. I undervalued the recovery obtained by Plaintiff. (*Id.* at pp. 15-17).

5. I undervalued the time spent by Plaintiff's counsel. (*Id.* at pp. 17-18).

6. I gave an inadequate explanation for awarding $50,000 for the corporate governance reforms. (*Id.* at pp. 20-21).

I think the biggest single factor in my thinking about the proper amount of attorney's fee award was my conclusion that this was a "one-off mistake." I based this conclusion on the explanation for the wrongfully issued stock options. That was counsel's explanation during one of the various status conferences I had with the parties. (D.I. 43 at 18 (Defendants' counsel: "one-time occurrence"); *see also id.* at 10-11 (Plaintiff's counsel)). It was ABC's explanation in its August 7, 2013, Form 8-K filing with the SEC. In that filing, ABC explained that the wrongfully-issued 2012 award was the result of a change in the timing of when ABC reviewed equity awards.

> In November 2012, the [Compensation and Succession Planning] Committee [of the Board of Directors] revised its policy on the timing of annual equity awards to executives and other eligible employees. Previously, the Committee reviewed annual equity awards in February or March of each year. The Committee now reviews annual equity awards in November of each year. As a result, fiscal year 2012 equity awards and fiscal year 2013 equity awards were made in the same calendar year.

(D.I. 30-3 at 3). The Form 8-K explanation is also consistent with the recitation of events in Defendants' motion to dismiss. (D.I. 12, pp. 13-14).

In addition to ABC's explanation, which seems entirely plausible to me, the circumstances are consistent with the explanation. There was never any allegation that ABC

disguised or otherwise covered up the award.[2] The components that made up the improperly awarded options were publicly disclosed, by which I mean that the amounts of awards were stated in public securities filings. Assuming, as I did, that the publicly reported Form 8-K explanation was an accurate one, and that the Committee was only going to consider employee stock option awards once per fiscal year, the error was only going to happen once.

As the Court of Appeals noted, I implied that I thought a demand letter to the Board would have resolved the dispute. The Court of Appeals noted that I did not support this with a citation to anything in the record. I would say that my reasoning for the implication was as follows. One, the timing of the award was a mistake. Two, the Board (or at least a majority of it) was disinterested. Three, there was no justification for the incorrect timing of the award.[3]

---

[2] Even as of this writing, most of the relevant information is contained in one document available on the internet – the SEC Form 4 history for Mr. Collis, which has four entries for stock option awards in 2012, two on November 14 and two on February 29, with the total number of shares being 373250 + 29843 + 283467 + 24083, which equals 710,643 shares. See www.secform4.com/insider-trading/1191508.htm (last visited Dec. 12, 2017).

[3] The Court of Appeals noted that Defendants "deny any Plan violation or wrongdoing actually occurred." (D.I. 85-1 at 13). It is of course true that the Stipulation of Settlement (D.I. 26, p.4, ¶ 13) denies any Plan violation or wrongdoing, but, in my experience, virtually every stipulation of settlement denies any liability. It is of course further true that the motion to dismiss (D.I. 11 & 12) does not concede any sort of liability, but I think it is also fair to say that it does not explicitly deny Plaintiff's argument that the number of shares awarded Collis in 2012 exceeded the amount allowed under the Plan. There are three arguments made in the motion to dismiss. The first, and lengthiest, is the failure to make a demand. For a number of Defendants, this is the sole basis for seeking dismissal of the first three counts of the Complaint. The second argument, consisting of one page, is that there is a failure to state a claim against some of the individual defendants. The third, consisting of three pages, relates solely to the "duty of candor" claim. Thus, while there are references to "Defendants deny that the awards to Mr. Collis violated the Plan," (*e.g.*, D.I. 12, p.29), Defendants do not actually argue that the case should be dismissed because the Plan was not violated. I do note that Defendants state in the Stipulation of Settlement that they argued that "the awards to Collis were intended as compensation for different fiscal years and therefore did not violate the Plan," (D.I. 26, p. 4, ¶ 14), but that was not the basis for seeking dismissal.

Four, the Board's judgment, in my opinion, upon receiving a demand, would have been to comply with the law. The usual deference given to the business judgment of the Board would not have been available for an action contrary to the Plan. Therefore, to avoid the litigation expenses that would follow from defending the indefensible, the Board would have taken the appropriate action in response to a demand.

I also note in this regard that one of the consequences of there being no demand on the Board was that Plaintiff's complaint overstated the magnitude of the error. Plaintiff asserted that only "300,000 shares [were] permitted to be granted to any individual participant in one calendar year under the [Incentive] Plan." (D.I. 1, at 2, ¶ 1). Thus, the 758,810 shares awarded to Collis were asserted to be 458,810 shares over the Plan's limits. (Id., ¶ 2). As it turned out, both numbers were wrong. The Plan's limit was 600,000, and the shares awarded to Collis were 872,423. (D.I. 85-1 at 4).

I think the Plan violation would have been uncovered whether Plaintiff's counsel discovered it or not. The Court of Appeals stated that this conclusion was unsupported (which it was). The reason that I said this was because of my perception, from the handling of multiple cases of this type,[4] with a substantial number of the cases involving multiple Plaintiffs, and/or multiple counsel, and/or multiple venues, that there is a competitive market involving quite a few law firms out there reviewing SEC filings for potential wrongdoing that can then be the subject of income-generating litigation. The record supports the conclusion that Plaintiff's counsel was most likely the first to discover the violation in this case. So far as I know, Plaintiff's counsel

---

[4] According to CM/ECF, I am (or was) the assigned judge in sixty (60) open or closed cases filed with either the codes of 160 ("stockholders suits") or 850 ("securities/commodities"). Of course, my handling of some of those cases post-dates the ruling in this case.

-5-

was the only one to issue a press release, and it did so on January 18, 2013. (D.I. 30-1 at 2). A different plaintiff filed suit first. (Iclub filed on Feb. 7, 2013 (No. 2:13-cv-00688-NIQA (E.D. Pa.), which was eight days before Plaintiff filed suit in this District.) Thus, I do not say that someone else discovered the Plan violation first. I would have no basis to say that. All I do say is that, in my opinion, the essential facts were in the public record, and my opinion is that, if Plaintiff's counsel had not discovered the matter, someone else would have. Thus, I do not think that it matters to the award of attorney's fees who discovered the Plan violation first.

On the issue of recovery, the benefit conferred was the common fund of $5,048,000. As I said in the previous opinion, "I think a reasonable fee award is $550,000, which is roughly 10% of the common fund plus $50,000 for the corporate governance reforms." (D.I. 78, p. 10). The award, as explicitly stated, was based on the size of the common fund.

In the previous opinion, I emphasized the hours spent before settlement negotiations began in earnest. (D.I. 78, p. 8). I did so because that one-third of the total hours spent was during the time when the contingent fee nature of Plaintiff's counsel's work was most contingent. I was aware of the total amount of hours worked, as I had asked for that by order dated October 17, 2014, shortly before the settlement hearing. As summarized by Plaintiff (and supported by billing records), attorney's fees as of August 9, 2013, were $265,000, and through August 28, 2014, were $438,000. (D.I. 71). By emphasizing the hours spent before settlement talks began, I did not mean to say that the other hours meant nothing. What I intended was to indicate, to some degree, what I viewed as the contingent risk, since I think it is generally understood that the greater the contingent risk, the better the justification for a greater fee award. *See In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 293 (Del. 2002) ("the contingent nature of the

fee"); *see also In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *6 (Del. Ch. Mar. 28, 2011) (distinguishing "true contingent fee risk" as a basis for a greater award). Settlement discussions do not eliminate contingent risk, but I thought that in the circumstances of this case, settlement discussions would have been seen as likely to result in settlement. Once the August 7, 2013, Form 8-K was filed, and the Stipulation of Settlement was filed on August 16, 2013, there was very little contingent risk.

I have reviewed the time entries that occurred after August 16, 2013, through August 28, 2014. I think the hours in that time fall into four categories: (1) attempting to get me to lift the stay I imposed while KBC sought books and records from ABC; (2) responding to my requests for status; (3) monitoring and discussing collateral actions; and (4) doing what was necessary to complete the settlement process, including getting my approval. In my opinion, categories 2 and 4 were necessary to this case. Categories 1 and 3 were less necessary to this case. To be more specific, in regard to category 1, on August 16, 2013, I stayed the case after the settlement papers were filed so that related litigation in other courts could proceed to conclusion. (D.I. 27). I thought those proceedings might better inform my evaluation of the settlement. (D.I. 43 at 5-7). Plaintiff disagreed, and spent about 160 hours during the period from August 16 through September 11, 2013, mostly working on a "motion to reconsider" (which was never filed as such) and a "motion to lift stay," which was filed on September 10, 2013. (D.I. 28, 29, 30). In due course, the motion to lift stay was opposed by KBC Management, to which Plaintiff filed a reply brief. The reply brief required upwards of 34 further hours. I cannot parse how much of the nearly 200 hours were spent on the motion and the two briefs, as there are sometimes numerous descriptions of services provided, but I am confident that the overall activity pattern suggests that

the briefing was the great bulk of the nearly 200 hours. I do also note that some of the time was spent on activities that would have had to be done sooner or later anyhow, such as the expert declaration of Mr. Foley. (D.I. 30-12). In regard to category 3, there are multiple entries billed to keeping track of the progress of KBC's "220" request to ABC. See, for example, billing entries on 10/24/13, 11/21/13, 11/27/13, 11/28/13, 12/9/13, 12/30/13, 2/13/14, 2/14/14, 2/20/14, 4/15/14, 5/13/14, 5/23/14, 6/19/14, 6/23/14, 7/7/14, 7/10/14, 7/18/14. Many of these entries were only for a quarter of an hour, but, nevertheless, there was a lot of attention being paid to collateral litigation between KBC and ABC.

Thus, while it is true that Plaintiff's outside counsel spent 741 hours (D.I. 71-1 at 29) as of August 28, 2014, I do not agree that "all of counsel's efforts 'were necessary to the successful prosecution of this litigation.'" (D.I. 85-1 at 18). I consider that most of the nearly 200 hours spent trying unsuccessfully to lift the stay was, at least in part, trying to protect the settlement and to keep KBC from getting a share of the attorney's fees. This is consistent with what I thought and said before the 200 hours was spent. (D.I. 27).

The Court of Appeals held that my explanation was insufficient as to why "the amount of the award for the negotiated corporate governance reforms is not arbitrary." The Court of Appeals summed up the corporate governance reforms as: "certain prophylactic corporate governance reforms for a period of at least five years, including the requirement that the General Counsel of the Company verify that all awards made under the Plan are compliant and certify that all amendments to the Plan have been disclosed in the Company's SEC filings." (D.I. 85-1 at 5; *see also* D.I. 26 at 5-6). I valued these reforms at $50,000. I described them as "modest." The reason I did so is that I did not view there being a systemic problem at ABC. In the posture

of the case (that is, with Plaintiff arguing for the $1,000,000 in attorney's fees without any opposition), Plaintiff did not find it necessary to present me with any reasoned approach to valuing the corporate reforms. It was just rolled into the $1,000,000.

I note that at one point Defendant's counsel described the corporate reforms as "very significant" reforms. (D.I. 43 at 21). I think that overstates the case. There is now a lawyer – the General Counsel – who has to verify that the awards are Plan compliant. It seems as though the Compensation Committee was aware of what the Plan limits were, since there is no evidence in the record of any violation of the limits other than on the one occasion for one individual, which, in my opinion, was due to the shift in timing of the making of the award. Thus, while it is almost always useful to have counsel's certification of legality on a matter potentially subject to abuse (such as a financial award to a corporate executive), the chances of Plan non-compliance in the future is not great. What are the chances of a reoccurrence without the reforms? I would think 1% per year is a generous estimate. Thus, I might conclude that the reforms are worth 1% of the $5,048,000 corporate benefit achieved by this case, which would be $50,480, or $252,400 over the course of the five years. If the corporate benefit can be quantified, then Plaintiff's counsel should get the same share of it as counsel does of the other corporate benefits. At 15%, that would be $37,860. *See generally In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *6 (Del. Ch. Mar. 28, 2011) (conducting a similar analysis). I previously decided the amount of the award for the corporate benefit should be $50,000. That amount was based on judgment rather than calculation, and, under the circumstances, I am not going to decrease it.

One further thing. As I noted in my first opinion, the Delaware Supreme Court has recognized that "[w]hen a case settles early, the Court of Chancery tends to award 10-15% of the

monetary benefit conferred," and "[w]hen a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple depositions and some level of motion practice, fee awards in the Court of Chancery ranged from 15-25% of the monetary benefits conferred." *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1259-60 (Del. 2012). There were no depositions here, although Plaintiff did write a brief responding to the initial motion to dismiss. Plaintiff later argued, accurately, in support of his requested award, that it was "less than 20% of the value of the cancelled stock options alone." (D.I. 57, p.2). I do not think the requested award is consistent with the Delaware Supreme Court's summary of the Court of Chancery practices.

Thus, for the reasons stated in my earlier opinion (to the extent not inconsistent with the above), and for the further reasons stated above, I award Plaintiff the following fees:

```
.15 x 5,048,000 =    $757,200      attorney's fees in this Court[5]
                    +$101,853.50   attorney's fees on appeal
                    +$  3,126.26   expenses on appeal
                    +$ 14,606      expenses in this Court
                    +$ 50,000      additional benefit
Total =              $926,785.76
```

Plaintiff is awarded $926,785.76 in attorney's fees and expenses. A separate order consistent with this memorandum will be issued.

*[signature]*
United States District Judge

---

[5] Upon reflection and further review of the record, it seems to me showing some deference to the parties' agreement suggests using the upper end of the early settlement range might be a better exercise of discretion than using the bottom, since Plaintiff did have to brief a motion to dismiss.